UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                          CASE NO. **08-12284**

**RUBY MAE JOHNSON**                                                SECTION A

DEBTOR                                                                        CHAPTER 7

## REASONS FOR DECISION

Ruby Mae Johnson ("Debtor") filed a Petition for Voluntary Relief under Title 11, Chapter 7 on September 25, 2008. On April 20, 2009, Debtor filed an Objection to Proof of Claim Number One by GTE Federal Credit Union ("GTE") and Motion for Valuation ("Objection").[1] In the Objection, Debtor alleged that the debt owed to GTE had been satisfied and requested the Court value her home and determine what, if any, secured claims against it were subject to avoidance pursuant to 11 U.S.C. §506(a). The Objection came up for hearing on July 30, 2009.

During the hearing on the Objection, Debtor raised two affirmative defenses to allowance of GTE's claim. Debtor alleged that under Louisiana law, the GTE claim had been extinguished by accord and satisfaction, or alternatively, remission. After the hearing, the Court ordered the submission of post-trial briefs on the applicability of two affirmative defenses raised by Debtor. After the submission of briefs, the Court took the matter under advisement.

**I. Facts**

On February 22, 2002, the First City Court of the City of New Orleans rendered a judgment ("Judgment") against Alfred and Ruby Johnson ("Johnsons").[2] The Judgment found the Johnsons

---

[1] Pleading 54.

[2] Exhibit 4.

liable to NOME Federal Credit Union[3] for $10,997.10 plus continuing interest.[4] The court also awarded an "additional sum of 33 1/3% of both of said unpaid balances as and for attorneys' fees, and for all costs of suit, plus legal interest on said costs from date of expenditure until paid."[5] Therefore, as of March 11, 2002, GTE was owed $10,997.10 in principal, accrued interest through the date of Judgment of $3,829.61, attorney's fees of $4,937.29, and court costs in an undetermined amount.[6]

GTE recorded the Judgment in the mortgage records of Orleans Parish on March 11, 2002, under instrument number 643348. At the time of her filing, Debtor owned a single piece of real property located in Orleans Parish ("the Property"). The Property is burdened with a covenant in favor of the Louisiana Road Home Program ("Road Home"). The covenant imposes certain obligations in favor of the Road Home. Performance of those obligations is secured by the Property. Except for the judicial mortgage lien of GTE, no other encumberances exist against the Property. Because the Road Home's covenant was placed after the recordation of the GTE mortgage, GTE's security interest primes.

Debtor has claimed a homestead exemption on the Property. In a prior ruling rendered on May 14, 2009, this Court held that Debtor's homestead exemption over 4450 Congress Drive in New

---

[3] GTE is a successor in interest to NOME Federal Credit Union.

[4] *Id.*

[5] *Id.*

[6] Exhibit 4.

Orleans was subordinate to the claims of GTE's judicial mortgage because the property was abandoned as Debtor's homestead following Hurricane Katrina.[7]

In her Schedules, Debtor listed GTE as an unsecured creditor in the amount of $21,000.00.[8] Debtor did not list the debt as contingent, unliquidated or disputed. (P-30) On her Schedule of Assets, Debtor represented the value of Congress Drive to be $80,000.00.[9] No other evidence as to Congress Drive's value was offered at trial. The Court finds that Congress Drive has a value of $80,000.00.

The phone records of GTE reflect that on one occasion, a GTE employee advised Debtor that she was not allowed to discuss the account.[10] Although GTE's Manager testified that Debtor was directed to exclusively communicate with Richard Dimitry, counsel to GTE ("Dimitry"), GTE failed to produce any written evidence of this directive.[11] Further, GTE's phone logs and testimony established that both the Johnsons and GTE continued to communicate directly with each other regarding the Judgment.[12]

---

[7] Pleading 71. Following Hurricane Katrina Debtor moved to LaPlace, La., purchased a new home and filed for a homestead exemption on that property. "At that moment, GTE's judicial mortgage attached to Congress Drive free of any homestead exemption. Now that Debtor again resides on Congress, her homestead exemption is subject to and primed by GTE's judicial mortgage." Reasons for Judgment at 4.

[8] Pleading 30.

[9] Debtor scheduled a one-half interest in Congress Drive with a usufruct over the other one half interest. The value of Debtor's interest is scheduled for $40,000.00. Pleading 20.

[10] Exhibit 6, entry for August 9, 2006.

[11] On January 3, 2008, Dimitry did write the Johnsons and direct that all payments be sent to him. However, the letter was sent after Debtor's alleged final payment in October 2007. Further, the letter neither indicates that he is the only person able to receive payments on the account, nor does it limit communication on the account to Dimitry. Exhibit 9.

[12] Exhibit 6.

Following entry of the Judgment, the Johnsons made forty-nine (49) payments directly to GTE and eleven (11) to Dimitry totaling $13,958.83.[13] On July 24, 2007, Alfred Johnson died. Debtor forwarded her last payment of $202.72 to GTE on October 29, 2007, which included a notation "Paid in Full."[14] The payment followed a conversation with a GTE employee who advised that upon payment of $202.72 her account balance would be "zero." GTE applied the Debtor's payments to principal, but Dimitry applied them to accrued interest.[15]

Based on the Judgment, GTE filed a secured proof of claim for $22,022.69 on March 24, 2009. By amendments on March 30, 2009, and again on July 29, 2009, the claim was reduced to $21,040.99.

## II. Law and Analysis

### A. The Debt to GTE Was Not Extinguished

#### 1. Accord and Satisfaction

Under Louisiana law, a debt may be extinguished if:

1. Payment is made to the claimant;
2. The debt is unliquidated or subject to a bona fide dispute; and
3. A good faith tender of payment in full satisfaction of the debt was made.

La. R.S. 10:3-311(a).

Debtor argues that the Judgment is subject to a bona fide dispute and that the tender of her last payment to GTE on October 29, 2007, delivered as "Paid in Full," resulted in extinguishment of the Judgment by accord and satisfaction. GTE argues that the Judgment represented a liquidated

---

[13] Exhibit 3.

[14] *See*, front and back of check number 5169, Exhibit 3.

[15] Tr.T. p. 64, ll. 14-15.

4

debt. GTE further asserts that because the October 29, 2007, payment was delivered to GTE rather than Dimitry, payment was not received by GTE under its directive to pay Dimitry. Finally, GTE argues that the payment was not tendered in good faith. For these reasons, GTE maintains that the Judgment was not released by accord and satisfaction.

### a) Tender of Payment to The Claimant

In order for a claim to be extinguished by accord and satisfaction, payment must have been made to the claimant. Debtor delivered her last payment to GTE on October 27, 2007. Louisiana law provides that accord and satisfaction by use of an instrument may be effected through the delivery of a check with a statement that the check is offered as full payment.[16] In such a case, acceptance of the check is considered acceptance of the conditions accompanying tender.

The condition of tender must be conspicuous.[17] La.R.S. 10:1-201(10) defines "conspicuous," as "...written [such] that a reasonable person against whom it is to operate ought to have noticed it." "If the claimant can reasonably be expected to examine the check, almost any statement on the check should be noticed and is therefore conspicuous."[18] The Court concludes that the notation on the check, "Payment in Full" was a conspicuous condition of tender.

In order to protect institutional creditors from inadvertent accord and satisfaction, Louisiana law allows them to direct communications concerning disputed debts, including an instrument tendered in full satisfaction of the debt, to a designated person, office or place.[19] GTE argues that

---

[16] Official Comments to La.R.S.10:3-311, ¶1.

[17] La.R.S.10:3-311(b).

[18] Official Comments to La. R.S. 10:3-311, ¶ 4.

[19] La.R.S.10:3-311(c)(1).

it directed Debtor to make all payments to Dimitry. As a result, Debtor's payment of $202.72 directly to GTE, presumably to discharge her obligation, was ineffective because it was delivered to the wrong party.

According to GTE's telephone logs, Debtor began questioning the amounts owed under the Judgment in 2006.[20] On one occasion, and in response to one such inquiry, the Johnsons were told to contact Dimitry.[21] However, GTE's records do not support GTE's claim that the Johnsons were advised that Dimitry had exclusive control over their account. Nor were the Johnsons told to send payments exclusively to Dimitry. In fact, GTE produced no written evidence of its alleged direction to the Johnsons regarding their account.

The Court finds that GTE's oral referral to Dimitry in 2006 did not satisfy the requirements of La.R.S. 10:311(c) because it was not in writing, did not clearly state that Dimitry was the sole person with whom communications regarding the dispute should be directed, nor did it direct that payments in satisfaction of the account could only be made to Dimitry.[22]

Even if the Court were to consider the single telephone call in 2006 to be sufficient notice under the statute, that directive was waived by GTE's subsequent conduct. Despite its legal position that the Johnsons were to only send payments to Dimitry, GTE's accepted forty-nine (49) payments directly from the Johnsons without protest. GTE's telephone logs also reflect continued, direct communication with the Johnsons. The Court finds that any alleged directive GTE may have made to the Johnsons was thereafter waived by both GTE's continued direct communication with the

---

[20] Exhibit 6, entries for March 30, April 4, and August 9, 2006.

[21] On August 9, 2006, a GTE employee advised Debtor that she could not discuss the account and suggested Debtor contact Dimitry.

[22] Fn 11, *supra*.

6

Johnsons and its acceptance of payments. As a result, the Court finds that the check delivered in October 2007 was presented to a proper party for consideration and that the conditions of delivery and tender were conspicuous.

Although Debtor's tender of payment was accepted and deposited by GTE, Louisiana law provides a means for recanting an inadvertent acceptance. In such a case, the tendered funds may be returned within ninety (90) days of deposit as a means of refuting accord and satisfaction.[23] By the date of trial, GTE was aware that Debtor's October 2007 check contained accord and satisfaction language. Yet, at no point did GTE tender a return of funds to Debtor. For this reason, GTE may not avail itself of the provisions contained in La. R.S. 10:3-311(c)(2).

### b) Unliquidated and Disputed Claims

Nevertheless, the Court finds that the Judgment was not extinguished by accord and satisfaction because at the time of tender, the Judgment was a liquidated debt, not subject to a bona fide dispute and the tender was not made in good faith.

In *Ponchartrain Park Homes, Inc. v. Sewerage and Water Bd. of New Orleans,*[24] the Louisiana Supreme Court ruled that the existence of a final judgment between the parties prevented any subsequent application of the accord and satisfaction defense. The Court reasoned that the entry of a judgment liquidated the debt and ended all bona fide disputes. While Debtor acknowledges that the Judgment liquidated the amounts originally owed to GTE on two promissory notes, Debtor argues that at the time of tender, she disputed the amount remaining *under the Judgment*. Therefore,

---

[23] La.R.S.10:3-311(c)(2) and Official Comments, ¶ 6.

[24] *Ponchartrain Park Homes, Inc. v. Sewerage and Water Bd. of New Orleans*, 246 La. 893, 168 So.2d 595 (1964).

Debtor argues that the Judgment itself was in dispute and subject to extinguishment under the provisions of accord and satisfaction.

The Court acknowledges that it is theoretically possible for disputes regarding a liquidated debt to exist, based on events arising subsequent to the issuance of a judgment. However, the Court finds in this case that Debtor failed to articulate any dispute as to the amount owed, save the assertion of affirmative defenses. For this reason, it is unnecessary for the Court to address the issue of whether or not disputes arising after the entry of judgment might subject a liquidated debt to release by accord and satisfaction.

### c) Good Faith

Finally, Debtor's tender of "full payment" in October 2007 was not made in good faith. Debtor was fully aware at the time of tender that her obligations to GTE were in excess of $18,000.00. Just two month prior to her "final" payment, GTE had forwarded a letter to her counsel offering to settle the remaining sums under the Judgement for $12,000.00. Thus, when Debtor called GTE to request her balance, she had no reason to believe that she only owed $202.72. However, Debtor neither questioned the amount quoted, nor advised GTE that she believed the amount to be much greater. The Court concludes that Debtor's actions were an attempt to take advantage of GTE's mistake and not taken in good faith.

For the above stated reasons, Debtor's affirmative defense of accord and satisfaction is overruled.

**2. Remission of Debt**

Remission is a method by which undisputed claims may be discharged in whole or in part. No consideration is required, and the absence of dispute is wholly unimportant.[25] Remission may be express or tacit, but to be enforceable, a determination that the creditor intended to remit the claim or a finding that he has estopped himself to claim the contrary is required.[26] Remission is never presumed and the burden of proving its existence rests with those claiming its benefit.[27] Waiver or estoppel occurs where there is knowledge of the existence of a right, coupled with either an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that it has been relinquished.[28]

Debtor asserts that GTE's claim is unenforceable because the underlying debt was remitted. Immediately prior to the transmittal of Debtor's last payment, Debtor contacted GTE regarding her balance. Debtor testified that a GTE employee advised her that upon payment of $202.72 her account balance would be "zero." Debtor then tendered a payment directly to GTE in that amount.

On January 3, 2008, Dimitry wrote Debtor regarding future payments on her account. Although Debtor could not remember receiving this letter, GTE's records reflect that on January 7, 2008, Debtor contacted GTE. GTE's telephone log reflects a conversation with Debtor wherein she admitted the Judgment debt was $18,000.00 as of May 2007, but represented that Jim Caladine,

---

[25] *Cowley Corp. v. Shreveport Packing Co., Inc. of Kansas*, 440 So.2d 1345 (La. App. 2nd Cir. 1983), *writ den'd*, 444 So.2d 122 (La. 1984).

[26] *Gautney v. Gautney*, 814 So.2d 717 (La. App. 2nd Cir. 2002); and *Arledge v. Bell*, 463 So.2d 856 (La. App. 2d Cir. 1985).

[27] *Arledge, supra*.

[28] *Gautney, supra*.

GTE's Manager, had offered to settle for $12,000.00.[29]  In fact, GTE *had* offered to settle the remaining balance on the Judgment for a lump sum payment of $12,000.00.  That offer was communicated to Debtor's counsel by letter on August 8, 2007, or just five months prior.[30]

During the call Debtor requested her balance and upon being told it was "zero" asked for confirmation in writing.  Shortly thereafter a universal data form ("UDF") dated January 7, 2008, indicating that the balance on her account was zero and that the account had been closed was filed by GTE and a copy sent to Debtor.[31]  For the above reasons, Debtor asserts that the Judgment was remitted.

Debtor cites *Gulf States Finance Corp. v. Moses*[32] in support of her position.  In *Gulf States*, the defendant failed to make required payments on a loan secured by a vehicle.  As a result, Gulf States sent a representative to collect the money owed or, alternatively, to repossess the truck.  The truck was surrendered.  When Gulf States sued the defendant on the deficiency claim, defendant argued that the surrender released him from any deficiency.  The *Gulf States* Court disagreed explaining that remission is a conventional act which must be expressly given.  While the release may be oral or in writing, it must be clear that the lender intended to release the claim.  At the time of surrender, the defendant was given a written receipt.  The receipt was signed by defendant and authorized Gulf States to sell the vehicle, pay the reasonable expenses of sale and apply the net

---

[29] Exhibit 3, entries on January 7, 2008.

[30] Exhibit 13.

[31] Exhibit 5. GTE's On-Line Collection Module confirmed an entry made by Kathy Smith, a GTE employee, on or about January 7, 2008, which provided that "Account has zero bal was pd off in full with zero bal on 10/29/07.  Sent MBR copy of UDF..." Exhibit 6.

[32] *Gulf States Finance Corp. v. Moses*, 56 So.2d 221 (La. App. 2d Cir. 1951).

proceeds *towards* the liquidation of the loan. Nothing in the proof offered by the obligor established that the car was surrendered in full satisfaction of the debt, nor was there any evidence that Gulf States intended to release its potential deficiency. *Gulf States*, while instructive on the principles of remission, is not supportive of Debtor's position.

*Kirkpatrick v. BankAmerica Housing Services*[33] involves facts more closely aligned with this case. *Kirkpatrick* involved a loan secured by a mobile home. The Kirkpatricks stopped making payments on the mobile home after neither the seller nor manufacturer could repair its numerous problems. Sometime later, Kirkpatrick executed a "Voluntary Surrender of Collateral, Waiver of Notice of Sale and Consent to Assumption" ("Surrender"). The Surrender expressly reserved the bank's right to seek a deficiency claim after foreclosure on the collateral. The bank repossessed the home and sold it at private sale. Following the sale and in order to clear the title to the mobile home, the bank executed a Release of Lien ("Release") and forwarded it to the Department of Public Safety ("DPS") for recordation. Despite a $18,000.00 deficiency existing after the sale, the Release stated that the Kirkpatricks had satisfied the debt in full.

When the Kirkpatricks received a copy of the Release, they filed a petition for declaratory judgment requesting declaration that their account had been paid in full and nothing more was due. The question presented was whether the Release issued to the DPS waived the bank's right to a deficiency claim.

Under Louisiana law, a debt may be extinguished by remission if the obligee voluntarily surrenders the instrument evidencing the debt. In such a case, a rebuttable presumption of remission

---

[33] *Kirkpatrick v. BankAmerica Housing Services*, 34,692 (La. App. 2d. Cir. 11/2/01), 799 So.2d 831, 832.

arises.[34] Citing Louisiana Civil Code Articles 1888-1892, the *Kirkpatrick* Court first held that because the bank did not surrender the note, there was no intent to remit. Further, since the bank had forwarded the Release to the DPS, not the Kirkpatricks, the bank had not represented any intention to remit to the borrower. Finally, although the Release stated that the debt had been paid in full, the Court concluded that it was executed merely for the purpose of releasing the lien on the sold mobile home.

After finding that the bank continued in its efforts at collection following the filing of the Release, that the Release was an ordinary practice consistent with the resale of collateral, and that the bank had not delivered the underlying instrument evidencing the debt to the borrowers, the *Kirkpatrick* Court held that the Release was not a remission of the debt.

The dissent disagreed with the majority's rationale. Noting that remission does not require the return of the instrument evidencing the obligation but merely creates a presumption of remission if the instrument is returned, it reasoned that the failure of the bank to return the note was irrelevant. In reviewing the trial record, the dissent observed that the bank typically attached an affidavit reserving its right to a deficiency when filing the form release with DPS. In this case, the bank had failed to attach the reserving affidavit which was both against common industry practice and the practice of the bank. Finally, the dissent pointed out that a lender's subsequent actions cannot revive a debt once it is extinguished. For this reason, the bank's later collection efforts were irrelevant to a determination of its intent.

The dissent argued that the language contained in the Release clearly declared that the debt had been fully satisfied. It reasoned that the filing of the Release would lead anyone to conclude

---

[34] La.C.C.art 1889, Official Comment (b).

that the bank intended to release its full claim against the Kirkpatricks. Whether this was its intent or not, the bank's actions estopped it from claiming to the contrary under Louisiana jurisprudence.

In this case, there are two possible actions by GTE which might constitute a remission. The first occurred in October 2007, when GTE advised Debtor that her account balance was $202.72; Debtor sent GTE a check for $202.72 with the notation "Paid in Full"; GTE cashed the check; and credited Debtor's account. The second occurred in January 2008, when GTE issued the UDF in response to Debtor's request.

### a) October 2007

GTE testified that once the Judgment had been entered, it no longer recorded accruing, but unpaid, interest or fees against the account. Thus, when Debtor contacted GTE for the remaining balance owed, GTE's computers showed only $202.72 was owed. The minimal balance was due to the application of Debtor's prior payments against principal on GTE's books.[35] When GTE's employee quoted the remaining balance of $202.72, she did so because the books of the institution erroneously failed to account for subsequently earned interest and fees. Because GTE's employee did not know that any additional amounts were owed, she could not have intended to remit those sums. Instead, she simply read what GTE's records reflected. Thus, the statements by GTE's employee in October 2007 cannot be considered an express offer of remission.

Next the Court must consider the effect of depositing Debtor's October 2007 check. Unlike accord and satisfaction, remission is a convention or agreement between the parties. The agreement to remit may be oral or written, but it is typically not inadvertent. The only exception to consensual

---

[35] In fact, GTE's representation of its accounting method is incorrect. If GTE had applied Debtor's payments to principal from 2002 forward, Debtor would have paid off her principal balance in January 2006. Instead, GTE claims that her principal balance was not satisfied until October 2007. In short, GTE's mathematical calculations leave much to be desired.

13

remission is when the obligor's actions are so inconsistent with an agreement to remit, that it is estopped from claiming to the contrary. For example, a notice to debtors that a loan had been paid in full after offset against what was believed to be debtors' depository account did not constitute remission when the lender later discovered that the account was not debtors.[36]

Similarly, in *Plauche-Locke Securities, Inc. v. McCall*,[37] the lender and borrower agreed that upon payment of $400.00, the bank would release its security interest in borrower's vehicle. The bank intended to collect the balance after crediting the $400.00, however. Borrower tendered a check to the bank on the back of which was written, "by endorsement this check when paid is accepted in full payment of account ***." The lender cashed the check in the regular course of its business and without protest. The First Circuit had no difficulty in holding that there was no remission.

Debtor's notation on her October 2007 check "Paid in Full," its receipt, and deposit without protest, do not constitute a remission because nothing in the conversation with GTE indicated that upon payment of $202.72, Debtor would be released from all remaining sums. Debtor was fully cognizant that additional amounts were due and received no representation as to why those sums were not owed. For this reason, the Court finds that GTE did not expressly remit this obligation in October 2007.

But, were GTE's actions so inconsistent with its intent to collect that it is estopped from claiming otherwise? While the deposit of a check could under some fact patterns constitute waiver or estoppel, this does not end the inquiry. Waiver or estoppel occurs where there is knowledge of

---

[36] *Premier Bank, NA v. Robinson*, 618 So.2d 1037 (La. App. 1st Cir. 1993).

[37] *Plauche-Locke Securities, Inc. v. McCall*, 103 So.2d 296 (La.App. 1st Cir. 1958).

the existence of a right, coupled with either an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right *so as to induce a reasonable belief that it has been relinquished.*[38]

Debtor was well aware that in August 2007, just two months prior, GTE had offered to settle the Judgment for $12,000.00. Debtor knew that she owed more than $202.72 at the time she tendered payment. Debtor refrained from questioning the balance she was given and instead sought to take advantage of the employee's ignorance and perhaps GTE's lack of attention. For this reason, the Court holds that in October 2007, Debtor had no right to reasonably believe that the acceptance of $202.72 would remit or satisfy the Judgment. As a result, GTE is not estopped from claiming the debt by its actions in October 2007.

The second action by GTE that arguably constitutes a remission concerns GTE's delivery of the UDF, stating that Debtor's principal balance was "0" and the account was closed. The UDF was prepared in January 2008, almost three months after Debtor forwarded her last payment to GTE. It followed Dimitry's letter requesting payment and a call to GTE. In that call, Debtor advised GTE that she knew as of May that her balance was $18,000.00 but that Jim Caladine had offered to settle for $12,000.00. After being told by GTE's employee that she would have to speak with Caladine regarding any settlement, Debtor requested her balance. At this point, the GTE employee advised her that the balance was "zero." Debtor then requested written confirmation from GTE *that her account was satisfied*. GTE produced no evidence that the employee refused or indicated that something must be amiss. Shortly after this conversation with GTE, the UDF followed.

---

[38] *Gautney, supra*.

A UDF is a form sent by credit reporting participants to credit reporting agencies alerting them as to the status of a reported account. GTE argues that the UDF is not an admission that the account has been satisfied but that the principal balance has been paid. In its post-trial brief, GTE maintains that it does not report the full satisfaction of debts, *i.e.* the payment of interest, legal fees and costs, but merely the satisfaction of principal. GTE argues that since the UDF only refers to the balance outstanding for principal, the filing of its UDF with the credit reporting agency and its transmittal to Debtor cannot be considered a remission of the debt.

The Court does not agree. GTE did not reserve or make any distinction in the UDF regarding additional amounts owed. A fair reading of the UDF would lead anyone to believe that Debtor's account had no balance. The UDF also indicates that Debtor's account is *closed.* By declaring the account closed, GTE further signaled that nothing was due. Rather than provide that the account was still past due or written off, GTE used the term "closed" which along with the notation of a "0" balance, connotes that the account is satisfied and nothing more is due.

In addition, the UDF was filed and a copy sent to Debtor by GTE *when Debtor requested written confirmation that her account had been satisfied.* The Court concludes that GTE was aware when the UDF was prepared, filed and a copy forwarded to Debtor that additional sums might be due. Debtor herself admitted to GTE's employee in the conversation that her debt had been $18,000.00. She also indicated that a settlement for $12,000.00 had been offered. GTE's computer reflected something different, but the employee evidently chose to ignore the discrepancy, prepare, file and forward to Debtor the UDF.

After this call, GTE had the option of consulting with Dimirty regarding the balance due but evidently did not. Although GTE clearly did not intend to remit this obligation, its actions are so

16

inconsistent with this result that an estoppel argument is well placed. In the end, however, the Court does not believe that estoppel is warranted or proven. This conclusion is drawn not because of GTE's actions, but rather the mindset of Debtor.

It is clear from both Debtor's testimony and GTE's file notes in the telephone log, that Debtor knew, and recounted to GTE's employee, that she owed more than "0" on her account. She also knew that Dimitry and Caladine had discussed settlement for $12,000.00 just months before. As a result, she could not reasonably conclude that GTE intended to remit this debt. It is for this reason that the debt is not remitted.

### B. Calculation of the Amounts Owed

Despite making sixty (60) payments over five (5) years totaling $13,958.83 on a Judgment with a principal balance of $10,301.33, GTE still claims that $21,040.99 is due. Understandably, Debtor is confused, but the reason is simple enough. In 2002 when the Judgment was obtained, the amounts owed continued to bear interest at an 18% rate. Given the principal balance, $1,854.00 in interest accrued in the first year. Added to the principal balance was accrued interest as of the judgment date ($3,829.61), court costs and attorney's fees of 33 1/3% on the amounts owed as of the date of judgment.

GTE testified that it applied all payments from Debtor to principal. Dimitry represented that he credited all of Debtor's payments to accrued interest.[39] Based on the conflicting testimony, the Court has verified GTE's calculations by applying payments to interest first, then principal. The Court considers this calculation generous. If the Court were to apply payments to principal first and

---

[39] Fn 15, *supra*.

then outstanding fees and interest, Debtor's balance would only be $7,628.73.[40] Instead, GTE has been given the benefit of the conflict between its counsel and its Manager's testimony. Interest has been calculated based on a 365 day year for a per diem rate. Attorney's fees have been calculated based on the amounts owed as of the date of Judgment. Costs of collection have not been allowed because they were not proven at the trial on this matter.

As of December 31, 2009, the Court finds that Debtor owes $8,692.66 in principal, $3,313.95 in accrued interest as of December 31, 2009, with interest accruing at the rate of 18% on the remaining principal balance from January 1, 2010, forward, and attorney's fees of $4,937.29. A separate Order will be rendered in accord with these Reasons.

New Orleans, Louisiana, January 5, 2010.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[40] Total unpaid interest, $2,918.89; Attorney's fees, $4,709.84.